**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

---

JEFFERY LEICHLITER,

    *Plaintiff,*

    v.

DETROIT MEDICAL CENTER;
DETROIT RECEIVING HOSPITAL &
UNIVERSITY HEALTH CENTER

    *Defendants.*

**Civil Action No. 25-12522**

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff Jeffery Leichliter ("Plaintiff" or "Mr. Leichliter"), by and through his attorneys, Eisenberg & Baum, LLP, brings this Complaint against Defendants Detroit Medical Center and Detroit Receiving Hospital & University Health Center (collectively "Defendants"), and alleges the following:

## PRELIMINARY STATEMENT

1.  This action arises from Defendants' deliberate and systematic exclusion of a profoundly Deaf patient from meaningful participation in his own healthcare during a traumatic 13-day hospitalization involving five surgeries and acute opiate withdrawal. While hearing patients received comprehensive explanations, the opportunity to ask questions, and the ability to make informed decisions about their

care, Defendants relegated Mr. Leichliter to a separate and inferior tier of service—forcing him to endure his medical crisis in isolation, confusion, and fear.

2. Mr. Leichliter is profoundly Deaf and primarily communicates using American Sign Language ("ASL"). ASL is a distinct visual language, wholly separate from English, with its own grammar, syntax, and vocabulary. To receive equal access to healthcare services—not special treatment, but equal access—Mr. Leichliter requires a qualified ASL interpreter.

3. On August 13, 2022, Mr. Leichliter suffered devastating blast injuries to his left arm following an oxygen tank explosion. He was rushed to a non-party hospital and subsequently transferred to Defendant Detroit Receiving Hospital, where he remained hospitalized until August 26, 2022. During this time, he underwent five separate surgeries and experienced acute opiate withdrawal.

4. From the moment of his arrival, Defendants knew Mr. Leichliter was Deaf. They documented it repeatedly. They acknowledged his need for sign language communication. Yet for thirteen consecutive days, through five surgeries, through acute withdrawal, through critical treatment decisions, they deliberately chose not to provide a qualified ASL interpreter. This was not oversight; it was deliberate indifference to his fundamental civil rights.

5. While hearing patients in Defendants' facility received detailed explanations of their conditions, participated in discussions about treatment options, and provided

truly informed consent, Mr. Leichliter was excluded from these basic healthcare services. He was reduced to exchanging rudimentary written notes with his non-dominant hand while experiencing severe pain and withdrawal, a method Defendants knew was wholly inadequate for complex medical communication.

6.   This systematic exclusion violated Mr. Leichliter's fundamental right to equal access to medical services, a right guaranteed by federal and state law to all persons regardless of disability. Defendants created and maintained a discriminatory two-tiered system: full participation for hearing patients, exclusion and isolation for Deaf patients.

7.   Federal law is unequivocal: healthcare providers receiving federal funds must ensure effective communication with Deaf patients. This is not optional. It is not a courtesy. It is a civil right. *See* 45 C.F.R. § 92.202 and 45 C.F.R. § 84.77

8.   Defendants accepted millions in federal Medicare and Medicaid funds with the explicit contractual promise to provide non-discriminatory services. They broke that promise deliberately and repeatedly, enriching themselves with federal funds while denying Mr. Leichliter the equal services those funds were conditioned upon providing.

9.   The harm from this discrimination extends beyond the immediate violation of Mr. Leichliter's civil rights. He endured the humiliation of being treated as less worthy of communication than hearing patients, the dehumanization of being

reduced to gestures during medical crisis, and the ongoing trauma of never truly understanding what was done to his body during those thirteen days.

10. This discrimination was intentional and demonstrated deliberate indifference to Mr. Leichliter's federally protected rights. Defendants had actual knowledge of his disability, had thirteen days to obtain interpreters, knew that written notes were inadequate, yet made the conscious choice—day after day, surgery after surgery—to exclude him from meaningful participation in his own care.

11. Mr. Leichliter brings this action to vindicate his civil rights and seeks nominal and compensatory; declaratory, injunctive, and equitable relief; and attorney's fees and costs to redress Defendants' unlawful discrimination in violation of Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116; Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794; and Article 3 of the Michigan Persons with Disabilities Civil Rights Act ("PDCRA"), Mich. Comp. Laws § 37.1301, et seq.

## PARTIES

12. Plaintiff Jeffery Leichliter is a resident of Roseville, Michigan. He is profoundly Deaf, which substantially limits the major life activities of hearing and

speaking. He is therefore an individual with a "disability" within the meaning of the RA, the ACA, and the PDCRA.

13.   Defendant Detroit Medical Center ("DMC") is, upon information and belief, the parent organization and sole member of Defendant Detroit Receiving Hospital, operating as an integrated healthcare system. Both entities are organized as corporations under the laws of Michigan.

14.   Defendant Detroit Receiving Hospital & University Health Center ("Detroit Receiving Hospital") is a corporation with its principal place of business at 4201 St. Antoine Boulevard, Detroit, MI 48201. Detroit Receiving Hospital is a Level I trauma center and one of the largest hospitals in the Detroit metropolitan area.

15.   Upon information and belief, DMC and Detroit Receiving Hospital are places of public accommodation operating health programs that receive substantial federal financial assistance, including millions of dollars annually in Medicare and Medicaid reimbursements.

16.   In exchange for receiving these federal funds, DMC and Detroit Receiving Hospital expressly contracted with the federal government to comply with federal anti-discrimination laws, including the obligation to provide effective communication to individuals with disabilities.

17.   The federal government has substantially performed its obligations under these contracts, providing Medicare and Medicaid reimbursements, while

5

Defendants have materially breached their contractual obligations through deliberate discrimination.

## JURISDICTION AND VENUE

18.  This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this action arises under the laws of the United States. This Court has supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367.

19.  Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) because Defendants conduct substantial business in this District, and the discriminatory acts occurred in this District.

## STATEMENT OF FACTS

### A. Plaintiff's Disability and Communication Needs

20.   Jeffery Leichliter is profoundly Deaf. His primary and preferred language is American Sign Language (ASL).

21.  ASL is not English on the hands. It is a complete, complex language with its own linguistic structure. Written English is, for Mr. Leichliter, a second language that he cannot rely upon for complex or nuanced communication, particularly in high-stress medical situations.

22. Lipreading is inherently unreliable, with even skilled lipreaders understanding only 30% of spoken English under ideal conditions. In medical settings—with masked providers, technical terminology, and critical health information—accurate lipreading is virtually impossible.

22. The exchange of written notes in medical settings fundamentally denies Deaf patients equal access to healthcare services. While hearing patients engage in dynamic, real-time conversations with their providers—asking clarifying questions, expressing concerns, describing symptoms, and advocating for their preferences—Deaf patients forced to use written notes are categorically excluded from this level of participation.

23. Without qualified ASL interpretation, Mr. Leichliter cannot effectively communicate complex medical information, cannot provide truly informed consent, cannot ask questions about his treatment, and cannot participate as an equal partner in his own healthcare—all things that hearing patients do without impediment.

24. Effective communication is not merely a convenience; it is the cornerstone of the patient-physician relationship, essential for patient safety, autonomy, and human dignity.

**B. The Traumatic Injury and Transfer to Defendants**

25. On August 13, 2022, Mr. Leichliter sustained catastrophic blast injuries to his left arm and hand when an oxygen tank exploded. The explosion caused severe soft tissue damage and transection of his ulnar artery, requiring immediate medical intervention.

26. He was transported by ambulance to McLaren Macomb Hospital ("McLaren"), arriving at approximately 8:00 PM. A tourniquet had been placed in the field due to life-threatening arterial bleeding.

27. Staff at McLaren immediately recognized and documented Mr. Leichliter's disability. The Trauma Flowsheet explicitly noted both "HOH" (Hard of Hearing) and "Deaf", a distinction that matters. "Hard of Hearing" implies someone who might benefit from amplification; "Deaf" indicates someone requiring visual communication. This confusion could have been resolved with proper communication assessment.

28. During the critical initial assessment at McLaren, the Nurse's Notes confirm the inadequate communication: "pt is deaf" and "pt is writing on paper." While in excruciating pain and fearing for his life, Mr. Leichliter was reduced to scrawling notes with his non-dominant hand.

29. Unable to effectively communicate, Mr. Leichliter could not convey critical information including his prescribed Suboxone use for Opioid Use Disorder, could

not understand the assessment of his injuries, and could not participate in the decision to transfer him to another facility.

30.  Due to the severity of his injuries, Mr. Leichliter was transferred to Defendant Detroit Receiving Hospital's Level I trauma center, leaving McLaren at approximately 9:35 PM on August 13, 2022.

### C. Thirteen Days of Systematic Exclusion at Detroit Receiving Hospital

31.  Mr. Leichliter arrived at Detroit Receiving Hospital late on August 13, 2022, beginning a hospitalization that would last until August 26, 2022—thirteen days of systematic discrimination and exclusion.

32.  Detroit Receiving Hospital staff immediately knew of his disability. The initial Orthopedic Consultation documented: "Patient is a 54y/o deaf male" who "communicates only through sign language and writing."

33.  This knowledge triggered Defendants' legal obligation to provide effective communication. In metropolitan Detroit, qualified ASL interpreters are readily available. Defendants had thirteen days, 312 hours, to arrange interpreter services. They deliberately chose not to.

34.  Instead, Defendants implemented and maintained a discriminatory two-tiered system of care: comprehensive communication and full participation for

hearing patients, while Mr. Leichliter was segregated into an inferior class of service marked by exclusion, isolation, and silence.

**The First Surgery: Emergency Exclusion (August 13, 2022)**

35.   Upon arrival at Detroit Receiving Hospital, Mr. Leichliter required surgery for a transected ulnar artery and extensive wound debridement. From this first moment, Defendants discriminated against him.

36.   No interpreter was provided. Defendants knew he was Deaf. They documented it. Yet they proceeded with surgery without any attempt at meaningful communication. While hearing patients receive information about their procedures even in urgent situations, Mr. Leichliter was denied any explanation, any opportunity to communicate his needs, fears, or medical history.

37.   This was not a one-time failure—it was the first act in thirteen days of systematic discrimination. Defendants' immediate exclusion of Mr. Leichliter from communication about his own surgical care revealed what would become clear over the following days: they maintained no systems, no protocols, and no intention of providing equal access to Deaf patients.

**The Second Surgery: Deliberate Exclusion Begins (August 15, 2022)**

38. Two days later, on August 15, 2022, Mr. Leichliter underwent his second surgery—irrigation and debridement with wound VAC exchange. The emergency had passed. Defendants had 48 hours to arrange an interpreter. They chose not to.

39. The Operative Report claims "informed written consent was signed by the patient after the risks benefits and alternatives to treatment were discussed." This is false. There was no meaningful discussion. There was a Deaf patient presented with forms he could not fully understand for a procedure that was not adequately explained.

40. While hearing patients were able to ask questions—"What are the risks?" "What happens if we don't do this?" "Are there alternatives?"—Mr. Leichliter was denied this fundamental aspect of informed consent solely because of his disability.

**The Third and Fourth Surgeries: Pattern of Discrimination Established (August 17, 2022)**

41. Mr. Leichliter required additional irrigation and debridement procedures, including surgery on August 17, 2022. Medical records confirm a total of four I&D procedures before the final skin graft.

42. For the August 17 surgery, the operative report states providers "had a discussion with the patient." Again, this is incorrect. Defendants' own records

elsewhere confirm they were using written notes, not discussion, but a discriminatory substitute that denied equal access.

43. By this point, Defendants had maintained their discriminatory practices for four days. This was not oversight or resource limitation, it was deliberate indifference to Mr. Leichliter's civil rights.

**Acute Opiate Withdrawal: Discrimination at Maximum Vulnerability (August 19, 2022)**

44. On August 19, 2022, Mr. Leichliter began experiencing acute opiate withdrawal because his prescribed Suboxone regimen had been interrupted upon admission. He was suffering "significant withdrawal symptoms" including tremors, nausea, body aches, restlessness, and severe anxiety.

45. The Medication Assisted Therapy (MAT) team was consulted. Their note explicitly documents the discriminatory communication method: "Patient is deaf and history was taken by writing notes on paper."

46. This represents deliberate indifference at its most callous. Defendants forced a patient experiencing acute withdrawal—shaking, nauseated, anxious, unable to keep his injured arm still—to communicate about complex addiction medicine through hastily scrawled notes.

47.   Consider the parallel: A hearing patient experiencing withdrawal would receive comprehensive discussion about symptoms, medication options, treatment approaches, and comfort measures. They could express their fears, ask questions, and participate in their treatment plan. Mr. Leichliter was categorically excluded from all of this solely because of his disability.

**The Fifth Surgery: Completing the Pattern (August 21, 2022)**

48.   On August 21, 2022, Mr. Leichliter underwent his fifth and final inpatient surgery—a split-thickness skin graft harvested from his thigh and applied to his arm.

49.   Again, no interpreter was provided. Again, the consent process excluded him from meaningful participation. Again, Defendants chose discrimination over accommodation.

50.   By this surgery, Defendants had maintained their discriminatory practices for eight full days. They had completed five surgical procedures on a patient they knew was Deaf without once providing effective communication. This was not accident or oversight, it was practice.

**Discharge: Token Gesture After Thirteen Days of Discrimination (August 26, 2022)**

51. On August 26, 2022—after thirteen days of systematic exclusion—Defendants finally provided some form of sign language assistance at discharge. The Discharge Summary claims "With the assistance of an ASL interpreter discharge instructions were given."

52. However, this overstates what occurred. Defendants provided a nurse who knew only fingerspelling and basic signs—not a qualified interpreter capable of conveying complex medical discharge instructions, medication regimens, and follow-up care requirements.

53. This last-minute, inadequate gesture highlights the discriminatory nature of the preceding thirteen days. If Defendants could arrange even limited sign language assistance for discharge, they could have—and legally should have—provided qualified interpreters throughout the hospitalization.

**D. Continued Discrimination in Post-Discharge Care**

54. Defendants' discrimination did not end at discharge. Mr. Leichliter required extensive follow-up care, including physical therapy, occupational therapy, and numerous orthopedic clinic visits.

55.   A September 20, 2022 clinic note documents that he "was having difficulty scheduling PT and OT with his ASL needs"—direct evidence that Defendants' discriminatory practices created ongoing barriers to necessary rehabilitation services.

56.   For multiple orthopedic follow-up visits on September 6, September 20, September 27, and October 25, 2022, Defendants failed to provide in-person ASL interpreters.

57.   Instead, they relied on Video Remote Interpreting (VRI) through the "IRIS app." VRI in medical settings is often inadequate—connections fail, video quality is poor, and interpreters cannot see important visual information. It is a cost-saving measure that perpetuates unequal access.

58.   It was not until March 28, 2023—over seven months after his initial injury—that records document an in-person "ASL translator present for the interview" during a clinic visit.

**E. The Lasting Impact of Systematic Discrimination**

59.   The weight of Defendants' discrimination continues to burden Mr. Leichliter. On December 18, 2023, over a year after his hospitalization, he asked his providers directly: Did the discrimination affect his outcome? The clinic note states:

"They did ask us if they felt he would have had a more favorable outcome if he would have had an ASL interpreter while he was in the hospital."

60.  The provider documented this crucial question but deflected responsibility, stating they were "unable to say whether that would have given him a better outcome or not."

61. This deflection misses the fundamental point: The discrimination itself was the injury. The exclusion from participation, the denial of communication, the relegation to second-class status—these are inherent harms regardless of medical outcome.

62. That Mr. Leichliter must live with this uncertainty—forever wondering whether equal treatment would have made a difference—is itself a continuing harm of the discrimination.

## F. Defendants' Deliberate Indifference to Federal Civil Rights

63. Defendants' discrimination was not accidental or inadvertent. It was the product of deliberate indifference—actual knowledge of Mr. Leichliter's disability combined with conscious failure to provide legally required accommodations.

64. The elements of deliberate indifference are starkly clear: a. Actual knowledge: Defendants documented Mr. Leichliter's deafness repeatedly from the moment of arrival b. Obvious need: Complex medical treatment and multiple

surgeries plainly require effective communication c. Available resources: Qualified interpreters are readily available in metropolitan Detroit d. Adequate time: Thirteen days provided ample opportunity to arrange services e. Conscious choice: Defendants proceeded with treatment knowing communication was ineffective

65. Defendants maintain no meaningful policies for ensuring communication access for Deaf patients. They have no systematic process for assessing communication needs, no protocol for arranging interpreters, no training on communication obligations, and no accountability for discrimination.

66. Notably, Defendants undoubtedly provide spoken language interpreters for hearing patients who speak Spanish, Arabic, or other languages. They recognize that language barriers prevent equal access to medical care—but only for hearing patients. This differential treatment demonstrates that their discrimination is based on disability status, not language access.

### G. The Nature and Scope of the Harm

67. The discrimination Mr. Leichliter experienced caused profound and multifaceted harm:

68. **Dignitary harm**: Being treated as less worthy of communication than hearing patients **Autonomy harm**: Being excluded from participation in his own medical decisions **Information harm**: Being denied understanding of his medical

condition and treatment **Emotional harm**: Experiencing fear, isolation, anxiety, and humiliation **Ongoing harm**: Living with permanent uncertainty about his treatment and outcome

69.  These are not consequential damages, they are direct injuries inherent in the civil rights violation itself. When a healthcare provider treats a patient as unworthy of communication during medical crisis, the humiliation and dehumanization are immediate and lasting.

## H. Contractual Breach and Unjust Enrichment

70.  Defendants receive millions of dollars annually in Medicare and Medicaid reimbursements. These federal funds come with explicit conditions—recipients must comply with federal anti-discrimination laws.

71. By accepting these funds, Defendants entered binding contracts with the federal government. Mr. Leichliter is an intended third-party beneficiary of these contracts, which exist specifically to protect individuals like him from discrimination.

72. Defendants materially breached these contracts by maintaining discriminatory policies and deliberately denying equal access to Deaf patients. They took the federal money while refusing to provide the non-discriminatory services that money was conditioned upon.

73. Defendants were unjustly enriched by keeping both the federal funds and the cost savings from denying interpreter services—a double benefit from discrimination.

**I. Systemic Discrimination and Continuing Threat**

74. Based on the documented pattern—thirteen days without hospital interpreters, months of inadequate VRI for follow-up, barriers to accessing therapy, Defendants maintain systemic discriminatory policies that categorically deny equal access to Deaf patients.

75. Mr. Leichliter resides in Defendants' service area. As someone with a significant medical history including traumatic injury, he may require future care from Defendants. Given their demonstrated deliberate indifference to Deaf patients' rights, he faces credible threat of future discrimination.

76. Without injunctive relief, Defendants will continue their two-tiered discriminatory system, providing full access to hearing patients while systematically excluding Deaf patients from equal participation in their care.

**<u>CAUSES OF ACTION</u>**

**CLAIM I**
**Violations of Section 1557 of the Patient Protection and Affordable Care Act**
**(42 .S.C. § 18116)**

77. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

78. At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act (ACA) has been in full force and effect and has applied to Defendants' conduct.

79. At all times relevant, Mr. Leichliter has been an individual with a disability within the meaning of the ACA. 42 U.S.C. § 18116.

80. At all times relevant, Defendants operated a "health program or activity," parts of which received federal financial assistance, including Medicare and Medicaid reimbursements, and Defendants are principally engaged in the business of providing health care. 42 U.S.C. § 18116(a).

81. Section 1557 of the ACA prohibits discrimination on the basis of disability under any health program or activity receiving Federal financial assistance, incorporating the grounds prohibited under Section 504 of the Rehabilitation Act. 42 U.S.C. § 18116(a).

82. At all times relevant, Mr. Leichliter's primary language for communication has been ASL, and he has limited ability to read and understand English. He has thus

also been an individual with limited English proficiency within the meaning of Section 1557. 45 C.F.R. § 92.4.

83. Regulations implementing the ACA mandate that a covered entity "shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1) (incorporated by 45 C.F.R. § 92.102(a)).

84. To ensure effective communication, a covered entity "shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities... an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity." 28 C.F.R. § 35.160(b)(1). "Auxiliary aids and services" explicitly include "qualified interpreters." 28 C.F.R. § 35.104.

85. In determining what auxiliary aids are necessary, a covered entity "shall give primary consideration to the requests of individuals with disabilities." 28 C.F.R. § 35.160(b)(2).

86. As set forth above, Defendants discriminated against Mr. Leichliter on the basis of his disability by failing to provide effective communication. This includes:

a. Defendants' failure to provide qualified interpreters during his hospitalization from August 13 to August 26, 2022, including for five surgeries and the associated informed consent processes.

b. Defendants' reliance on "writing notes on paper" to communicate with Mr. Leichliter during a critical MAT consultation on August 19, 2022, while he was suffering from acute opiate withdrawal.

c. Defendants' failure to provide interpreters throughout the 13-day hospitalization, except at the moment of discharge.

d. Defendants' reliance on VRI services ("IRIS app") instead of in-person interpreters for complex post-operative follow-up appointments in September and October 2022.

87. Defendants' violations were the result of deliberate indifference to Mr. Leichliter's federally protected rights, as Defendants had actual knowledge of his deafness and communication needs yet failed to provide necessary auxiliary aids.

88. The ACA incorporates the enforcement mechanisms of the Rehabilitation Act, extending a cause of action to "any person aggrieved" by discrimination. 42 U.S.C. § 18116(a).

89. The Rehabilitation Act—and by extension, the ACA—authorize the full panoply of remedies traditionally available in suits for breach of contract, as these statutes were enacted pursuant to Congress's Spending Clause authority.

90. Furthermore, the Rehabilitation Act explicitly authorizes remedies available under 42 U.S.C. § 1981a, which expressly permits compensatory damages for "emotional pain" and "mental anguish." See 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 2000e-5(e)(3)(B); 42 U.S.C. § 1981a(b)(3).

91. Defendants have failed to implement policies, procedures, and training of staff necessary to ensure compliance with the Patient Protection and Affordable Care Act.

92. Mr. Leichliter is entitled to injunctive relief; attorney's fees, costs, and disbursements; and compensatory damages, including expectation-interest damages and damages for emotional distress, for the injuries and loss he sustained as a result of Defendants' discriminatory conduct and deliberate indifference.

## CLAIM II
### Violations of Section 504 of the Rehabilitation Act
### (29 .S.C. § 794)

93. Plaintiff incorporates by reference all preceding paragraphs and realleges them in support of this claim.

94. At all times relevant to this action, Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 794, has been in full force and effect and has applied to Defendants' conduct.

95. At all times relevant, Plaintiff has been an "individual with a disability" and is "otherwise qualified" to receive medical services from Defendants.

96. At all times relevant, Defendants have been a "program or activity receiving Federal financial assistance" under 29 U.S.C. § 794(b).

97. Section 504 of the RA provides that no "otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

98. Discrimination under the RA includes the failure to ensure effective communication. Regulations implementing the RA require recipients of federal funds that provide health services to provide auxiliary aids to ensure individuals with disabilities are not denied the benefits of, or excluded from participation in, their programs and services. 45 C.F.R. § 84.52(d).

99. Under the RA, discriminatory actions include affording a qualified individual with a disability "an opportunity to participate in or benefit from the aid, benefit, or

service that is not equal to that afforded others," or providing a service "that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement" as that provided to others. 45 C.F.R. § 84.4(b)(1)(ii)-(iii).

100.    Defendants discriminated against Plaintiff solely on the basis of his disability by denying him meaningful access to their medical services and by refusing to provide the auxiliary aids (qualified ASL interpreters) necessary to ensure effective communication. This occurred repeatedly throughout his 13-day hospitalization at Detroit Receiving Hospital, including during five surgeries and management of acute withdrawal.

101.    Defendants' failure to provide effective communication constitutes intentional discrimination because Defendants acted with deliberate indifference to Plaintiff's federally protected rights. Defendants had actual knowledge of Plaintiff's disability and his need for interpreters, yet consciously failed to provide them.

102.    Defendants have failed to implement adequate policies, procedures, and training of staff necessary to ensure compliance with the Rehabilitation Act and its implementing regulations.

103.    As detailed in Claim I (Paragraphs 88-89), the Rehabilitation Act authorizes compensatory damages, including damages for emotional distress.

104.    Plaintiff is also entitled to other forms of compensatory damages beyond emotional distress damages, as the RA authorizes remedies traditionally available in suits for breach of contract.

105.    Plaintiff had an expectation interest in receiving non-discriminatory care, including the ability to communicate effectively with healthcare providers about his condition and treatment, as required by federal law.

106.    Defendants denied Plaintiff these expectation interests by failing to accommodate his disability and failing to provide treatment equal to that given to non-disabled patients. Accordingly, the Plaintiff is entitled to compensatory damages under his expectation interest.

107.    Plaintiff is therefore entitled to declaratory and injunctive relief, nominal damages, compensatory damages (including expectation-interest damages and damages for emotional distress), and attorneys' fees, costs, and disbursements for the injuries and loss he sustained as a result of Defendants' discriminatory conduct and deliberate indifference.

## CLAIM III
## Violations of Article 3 of the Michigan Persons with Disabilities Civil Rights Act
## (Mich. Comp. Laws § 37.1301, et seq.)

108.      Mr. Leichliter incorporates by reference all preceding paragraphs and realleges them in support of this claim.

109.      At all times relevant to this action, the Persons with Disabilities Civil Rights Act (PDCRA) has been in full force and effect and has applied to Defendants' conduct.

110.      At all times relevant, Mr. Leichliter is a person with a disability within the meaning of the PDCRA, Mich. Comp. Laws § 37.1103(d).

111.      At all times relevant, Defendants' facilities are "places of public accommodation" within the meaning of the PDCRA, Mich. Comp. Laws § 37.1301(a), as they are establishments offering services, facilities, and accommodations to the public.

112.      Article 3 of the PDCRA prohibits denying an individual the "full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation... because of a disability..." Mich. Comp. Laws § 37.1302(a).

113.     The PDCRA imposes a duty on places of public accommodation to accommodate a person with a disability, unless the entity demonstrates that the accommodation would impose an undue hardship. Mich. Comp. Laws § 37.1102(2); § 37.1303.

114.     Defendants discriminated against Mr. Leichliter on the basis of disability by failing to provide the necessary accommodation of qualified ASL interpreters, thereby denying him the full and equal enjoyment of their medical services.

115.     Defendants further discriminated against him by failing to ensure effective communication, forcing him to endure critical medical treatment, including five surgeries and acute withdrawal management, without understanding his care or being able to meaningfully participate in his treatment decisions.

116.     The provision of qualified ASL interpreters would not have imposed an undue hardship on Defendants, which are large, sophisticated healthcare corporations with substantial resources.

117.     Defendants have failed to implement policies, procedures, and training of staff necessary to ensure compliance with Article 3 of the PDCRA.

118.     As a direct and proximate result of Defendants' violations of the PDCRA, Mr. Leichliter suffered severe emotional distress, fear, humiliation, and a loss of dignity.

119.     Plaintiff is therefore entitled to injunctive relief; attorneys' fees, costs, and disbursements; and compensatory damages for the injuries and loss he sustained as a result of discriminatory conduct, pursuant to the PDCRA, Mich. Comp. Laws § 37.1606.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Jeffery Leichliter respectfully requests that this Court enter judgment in his favor and against Defendants, as follows:

A.     A Declaratory Judgment that Defendants' actions, policies, and practices, as alleged herein, violated Section 504 of the Rehabilitation Act, Section 1557 of the Affordable Care Act, and Article 3 of the Michigan Persons with Disabilities Civil Rights Act.

B.     A permanent injunction forbidding Defendants from implementing or enforcing any policy, procedure, or practice that denies Deaf individuals meaningful access to, and full and equal enjoyment of, Defendants' facilities, services, or programs.

C.     An injunction ordering Defendants to adopt, implement, and monitor policies and procedures to ensure effective communication, including, but not limited to:

i. Providing qualified sign language interpreters (in-person, or through high-quality Video Remote Interpreting only if appropriate for the interaction and consistent with regulatory requirements) at no cost to the patient, whenever necessary for effective communication with a Deaf or hard of hearing patient or companion;

ii. Developing and implementing a mandatory, regular training program for all employees, medical staff, and agents regarding the rights of individuals who are Deaf or hard of hearing under state and federal law, the importance of effective communication, the inadequacies of written notes for complex medical interactions, and the procedures for securing auxiliary aids and services;

iii. Implementing a reliable system to assess the communication needs of patients upon intake and ensuring that requests for auxiliary aids are promptly and appropriately addressed, giving primary consideration to the patient's request;

iv. Developing, implementing, and complying with a policy requiring a clear offer of language assistance services. If a patient declines language assistance services, documenting such refusal in a specific and uniform location in the patient's medical records. Such documentation shall include, at a minimum: (1) an acknowledgement, signed by the patient, that the availability of free language assistance services was explained to the patient in the patient's primary language and that he or she knowingly declined those services; (2) the name of the interpreter used to explain this right; and (3) the patient's reason for refusing language assistance services.

v. Appointing an ADA/Section 504 Coordinator responsible for ensuring compliance with effective communication requirements and overseeing a grievance procedure.

D. An order requiring Defendants to provide equitable relief to restore Mr. Leichliter to the position he would have been in but for the discrimination, including honoring Plaintiff's right to understand his medical history by providing qualified American Sign Language interpreters to comprehensively explain all prior diagnoses, procedures, and treatments related to his injury that occurred without effective communication, allowing him the opportunity to ask questions.

E. An award to Plaintiff of:

i. Nominal damages;

ii. Compensatory damages

iv. Reasonable costs and attorney's fees, including expert witness fees, pursuant to 29 U.S.C. § 794a(b), 42 U.S.C. § 18116, and Mich. Comp. Laws § 37.1606;

v. Pre-judgment and post-judgment interest at the highest rates and earliest dates allowed by law; and

vi. Any and all other relief that this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: August 13, 2025

Respectfully submitted,

Andrew Rozynski (NY# 5054465)
**EISENBERG & BAUM, LLP**
24 Union Square East, PH
New York, NY 10003
(212) 353-8700
arozynski@eandblaw.com
*Attorneys for Plaintiff*